**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAROL KANE and BONNIE WILSON, *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>UNIVERSITY OF ROCHESTER,<br><br>Defendant. | Case No. 6:23-cv-06027<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Carol Kane and Bonnie Wilson bring this class action lawsuit in their individual capacities and on behalf of all others similarly situated against University of Rochester ("University" or "Defendant")[1] and allege, upon personal knowledge as to their own actions and experiences, their counsel's investigation and upon information and good faith belief as to all other matters, as follows.

## INTRODUCTION

1. Information concerning a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can have serious consequences, including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage.[2]

---

[1] Through counsel, Defendant has indicated that the University of Rochester is the appropriate defendant. Plaintiffs reserve the right to add additional parties as the case progresses.

[2] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022), available at https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ (last visited April

2. Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical providers is vitally necessary to maintain public trust in the healthcare system as a whole.

3. This case concerns a very serious breach of University's data privacy and security obligations as it installed certain tracking technologies on its digital properties to collect and to disclose to unauthorized third parties Plaintiffs' and Class Members' personally identifiable information ("PII") and non-public personal health information ("PHI" and with PII, "Private Information") for its own pecuniary gain.

4. Specifically, in order to gain additional insights into its patients, improve its return on its marketing dollars and, ultimately, to increase its revenue, the University encouraged Plaintiffs and Class Members to access and to use various digital tools via its clinical website for the University of Rochester Medicine ("UR Medicine," also f/k/a "URMC"), https://www.urmc.rochester.edu/ (the "Website") and its MyChart Portal (the "Portal" and with the Website, the "Properties") in order to, among other things, receive healthcare services.[3]

---

11, 2023) ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), available at https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited April 11, 2023).

[3] *See* https://mychart.urmc.rochester.edu/mychart/ (encouraging patients to sign up for the portal so that they may "[b]ecome more engaged with your health, message your providers, view test results, appointments, pay your bills, and more!") (last visited April 11, 2023).

5. Plaintiffs and Class Members who visited and used (collectively, the "Users") Defendant's Properties understandably thought they were communicating *only* with their trusted healthcare providers.

6. Unbeknownst to Plaintiffs and Class Members, however, Defendant had embedded the Facebook Tracking Pixel (the "Pixel" or "Facebook Pixel") on its Web Properties which automatically transmits to Facebook every click, keystroke and detail about their medical treatment.[4]

7. Operating as designed and as implemented by the University, the Pixel allows the Private Information that Plaintiffs and Class Members provide to Defendant to be unlawfully disclosed to Facebook alongside the individual's unique and persistent Facebook ID ("FID").[5]

8. A pixel is a piece of code that "tracks the people and [the] type of actions they take"[6] as they interact with a website (or other digital property), including how long a person spends on a particular web page, which buttons the person clicks, which pages they view and the

---

4 Plaintiffs' research shows that the Facebook Pixel was embedded in Defendant's Website at the time of filing of the original Complaint. While there is no way to confirm with certainty that Defendant has installed the Pixel in its other Web Properties without access to the host server, upon information and good faith belief, Defendant's Portal is tracking Users' activities through the Facebook Pixel as well.

5 The Pixel forces the website user to share the FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser"; "[c]ookies help inform websites about the user, enabling the websites to personalize the user experience." *See* https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited April 11, 2023).

6 FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited April 11, 2023).

text or phrases they type into various portions of the website (such as a general search bar, chat feature or text box), among other things.

9. The user's web browser executes the Pixel via instructions within the webpage to communicate certain information based on parameters selected by the website's owner. The Facebook Pixel is thus customizable and programmable, meaning that the website owner controls which of its web pages contain the Pixel and which events are tracked and transmitted to Facebook.

10. By installing the Facebook Pixel, Defendant effectively planted a bug on Plaintiffs' and Class Members' web browsers and compelled them to unknowingly disclose their private, sensitive and confidential health-related communications with Defendant to Facebook.

11. In addition to the Facebook Pixel, Defendant, upon information and good faith belief, also installed and implemented Facebook's Conversions Application Programming Interface ("CAPI") on its Website servers.[7]

12. Unlike the Facebook Pixel, which coopts a website user's browser and forces it to disclose information to third parties in addition to the website owner, CAPI does not cause the User's browser to transmit information directly to Facebook. Rather, CAPI tracks the User's website interaction, including Private Information, records and stores that information on the website owner's servers and then transmits the data to Facebook from the website owner's servers.[8,9]

---

[7] CAPI "works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited April 11, 2023).

[8] https://revealbot.com/blog/facebook-conversions-api/ (last visited April 11, 2023).

[9] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in

13. Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[10]

14. Because CAPI is located on the website owner's servers and is not a bug planted onto the website User's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the User that would prevent the Pixel from sending website users' Private Information to Facebook directly.

15. The Facebook Pixel and CAPI are routinely used to target specific customers by utilizing data to build incredibly fulsome and robust profiles for the purposes of retargeting and future marketing. Facebook also uses Plaintiffs' and Class Members' Private Information to create targeted advertisements based on the medical conditions and other Private Information disclosed to Defendant.

16. Protected and highly sensitive medical information collected by healthcare entities includes many categories, from intimate details of an individual's treatment to any unique identifying code which can connect the individual to the collecting entity.[11]

---

a similar way as other connection channels." https://developers.facebook.com/docs/marketing-api/conversions-api (last visited April 11, 2023).

[10] https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited April 11, 2023).

[11] Even internet protocol ("IP") addresses—which in theory could be connected to several members of the same household—are considered protected health information ("PHI") *even when the individual does not have an existing relationship with the regulated healthcare entity* since when the medical provider collects this information through its website or mobile app, it is indicative that the individual has received or will receive health care services or benefits from the medical provider. *See* HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaaonline-tracking/index.html (last visited April 11, 2023).

17. The information that Defendant's Tracking Pixel and CAPI sent to Facebook included the Private Information that Plaintiffs and Class Members submitted to Defendant's Website, including, for example, patient status, the type of medical treatment sought, the individual's particular health condition and the fact that the individual attempted to or did book a medical appointment.

18. Such information allows a third party (*e.g.*, Facebook) to know that a specific patient was seeking confidential medical care. Facebook, in turn, sells Plaintiffs' and Class Members' Private Information to third-party marketers who geo-target Plaintiffs' and Class Members' Facebook pages based on communications obtained via the Facebook Pixel and CAPI.[12]

19. Healthcare patients simply do not anticipate that their trusted healthcare provider will send personal health information or confidential medical information collected via its web pages to an undisclosed third party – let alone Facebook, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue – without the patients' informed and express consent.

20. Neither Plaintiffs nor any other Class Member were provided, much less signed, a written authorization permitting Defendant to disclose their Private Information to Facebook.

21. Despite willfully and intentionally incorporating the Facebook Pixel and CAPI into its Website and servers, Defendant has never disclosed to Plaintiffs or Class Members that it shared their sensitive and confidential communications and Private Information with Facebook.[13]

---

[12] Facebook and any third-party purchasers of Plaintiffs' and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia or HIV.

[13] In contrast to Defendant, in recent months several medical providers which have installed the Facebook Pixel on their web properties have provided their patients with notices of data

22. Plaintiffs and Class Members were unaware that their Private Information was being surreptitiously transmitted to Facebook as they communicated with their healthcare providers via the Website or that their information was stored on Defendant's servers to be later transmitted to Facebook so it could be used for targeted advertising and marketing purposes.

23. The disclosure of Plaintiffs' and Class Members' Private Information via the Pixel contravenes the letter and spirit of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). As part of HIPAA, the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.

24. Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant Medicine are ***not*** permitted to use tracking technology tools (like pixels) in a way that exposes patients' Private Information to any third-party without express and informed consent from each patient.

25. Lest there be any doubt of the illegal nature of Defendant's practice, the Office for Civil Rights (OCR) at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the unlawful transmission

---

breaches caused by the Pixel transmitting PHI to third parties. *See, e.g., Cerebral, Inc. Notice of HIPAA Privacy Breach*, available at https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf (last visited April 11, 2023); *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies* (Oct. 20, 2022), available at https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3 (last visited April 11, 2023); *Novant Health notifies patients of potential data privacy incident* (Aug. 12, 2022), available at https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx (last visited April 11, 2023).

of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[14]

26. Defendant further made express and implied promises to protect Plaintiffs' and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant. Furthermore, by obtaining, collecting, using and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

27. Defendant has not disclosed to Plaintiffs or Class Members that it shares patients' sensitive and confidential communications via the Website with Facebook.

28. As a result, Plaintiffs and Class Members were unaware that their PII and PHI were being surreptitiously transmitted to Facebook as they communicated with their healthcare providers.

29. The University breached its obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web based technology to ensure the Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web users' information; (iii) failing to obtain the consent of Plaintiffs and Class

---

14 *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited April 11, 2023) (emphasis added).

Members to disclose their PII and PHI to Facebook or others; (iv) failing to take steps to block the transmission of Plaintiffs' and Class Members' PII and PHI through the Facebook Pixel; (v) failing to warn Plaintiffs and Class Members; and (vi) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient PII and PHI.

30. Plaintiffs and Class Members have suffered injury as a result of Defendant's conduct; these injuries include: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) compromise and disclosure of Private Information and identities, (iv) diminution of value of their Private Information, (iv) statutory damages and (v) the continued and ongoing risk to their Private Information.[15]

31. Plaintiffs seek to remedy these harms and therefore assert causes of action for (i) Invasion of Privacy, (ii) Breach of Contract; (iii) Breach of Fiduciary Duty; (iv) Unjust Enrichment; (v) Breach of Implied Contract; (vi) Violation of New York's Deceptive Trade Practices Act (New York Gen. Bus. Law § 349); (vii)-(viii) Violation of the Wiretap Act (18 U.S.C. § 2510, *et seq.*); (ix) Violation of the Stored Communications Act (18 U.S.C. § 2702, *et seq.*); and (x) Violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030, *et seq.*).

## **PARTIES**

32. Defendant University of Rochester is a registered non-profit entity with its headquarters and principal place of business at 252 Elmwood Avenue in Rochester, New York.

33. Defendant University of Rochester operates one of the largest facilities for medical

---

15 The exposed Private Information of Plaintiffs and Class Members can—and likely will—be further disseminated to additional third parties utilizing the data for retargeting or insurance companies utilizing the information to set insurance rates. Furthermore, third parties can often offer for sale the unencrypted, unredacted Private Information to criminals on the dark web for use in fraud and cyber-crimes.

treatment and research in New York, employing more than 26,000 employees and nearly 3,000 clinical researchers at the UR Medicine (formerly known as University of Rochester Medical Center).

34. Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 ("HIPAA").

35. Plaintiff Carol Kane is a natural person and citizen of the State of Florida.

36. Plaintiff Bonnie Wilson is a natural person and citizen of the State of New York.

37. As detailed herein, Plaintiffs accessed Defendant's Web Properties on their mobile devices and computers and used the Web Properties to look for providers, review conditions and treatments, make appointments and communicate with their providers. Plaintiffs have used and continue to use the same devices to maintain and to access active Facebook accounts throughout the relevant period in this case.

38. Further to the systematic process described herein, Defendant assisted Facebook with intercepting Plaintiffs' communications, including those that contained personally identifiable information, protected health information and related confidential information. Defendant assisted these interceptions without Plaintiffs' knowledge, consent or express written authorization.

## **JURISDICTION & VENUE**

39. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States, and under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least

one member of the class is a citizen of a state different from Defendant.

40. This Court has personal jurisdiction over Defendant because its principal place of business is in this District and a substantial portion of the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

41. Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## COMMON FACTUAL ALLEGATIONS

### *A. Defendant Improperly Disclosed Plaintiffs' & Class Members' Private Information.*

42. Defendant's clinical enterprise, UR Medicine, consists of six hospitals located throughout the Finger Lakes and Southern Tier regions – Strong Memorial, Highland, F.F. Thompson, Noyes Memorial, Jones Memorial and St. James hospitals, as well as Golisano Children's Hospital, James P. Wilmot Cancer Center, Eastman Institute for Oral Health, University of Rochester Medicine Home Care, the Highlands at Pittsford retirement community and Highlands at Brighton nursing home, nine urgent care centers and an extensive primary care network.[16]

43. As the owner and operator of these medical centers and entities, Defendant offers a wide range of services, from primary and urgent care to cancer treatment, cardiac and liver transplants, heart and vascular, orthopedics, hospice care, occupational health and senior living.[17]

44. Defendant's clinical Website, https://www.urmc.rochester.edu/, and its MyChart Portal, https://mychart.urmc.rochester.edu/mychart/, are accessible on mobile devices and desktop

---

16 *See* https://www.urmc.rochester.edu/about-us.aspx (last visited April 11, 2023).

17 *See* https://www.urmc.rochester.edu/departments-centers.aspx (last visited April 11, 2023).

computers.

45. Defendant utilized Facebook advertisements and intentionally installed the Pixel and CAPI on its Web Properties.

46. The Pixel is a piece of code that Defendant commonly used to measure activity and experiences on its Web Properties.

47. CAPI is another tool used by the Defendant to track its users' actions on its Web Properties, including by avoiding ad blockers that can prevent the Pixel from gathering users' data.

48. Through seeking and using Defendant's services as a medical provider, and utilizing the Web Properties services, Plaintiffs' and Class Members' Private Information was intercepted in real time and then disseminated to Facebook, and potentially to other third parties, via the Pixel that Defendant surreptitiously installed on its Web Properties.

49. Plaintiffs and Class Members did not intend or have any reason to suspect the Private Information would be shared with Facebook or that Defendant was tracking their every movement and disclosing same to Facebook when they provided highly sensitive information on the Web Properties.

50. Defendant did not disclose to or warn Plaintiffs or Class Members that Defendant used the Private Information contained in Plaintiffs' and Class Members' Web Properties submissions for marketing purposes.

51. Plaintiffs and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information.

52. Upon information and belief, Defendant intercepted and disclosed the following non-public private information to Facebook:

a. Plaintiffs' and Class Members' status as medical patients;

b. Plaintiffs' and Class Members' communications with Defendant through its Web Properties;

c. Plaintiffs' and Class Members' medical appointments, location of treatments, specific medical providers, and specific medical conditions and treatments;

d. Personally identifiable information including but not limited to patients' locations, an IP address, device identifier and/or an individual's unique Facebook user number ("FID").

53. Defendant deprived Plaintiffs and Class Members of their privacy rights when it: (i) implemented technology (*i.e.*, Pixels) that surreptitiously tracked, recorded, and disclosed Plaintiffs' and other online patients' confidential communications and Private Information; (ii) disclosed patients' protected information to Facebook—an unauthorized third-party; and (iii) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

***B. Background on Web Browsers & Source Code.***

54. Web browsers are software applications that allow consumers to exchange electronic communications over the Internet.

55. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with Internet users via their web browsers.

56. The set of instructions that commands the browser is called the source code.

57. Source code may also command a web browser to send data transmissions to third parties via pixels or web bugs, tiny 1x1 invisible GIF files that effectively open a spying window through which a website funnels data about users and their actions to third parties.

58. The third parties to whom the website transmits data through pixels or web bugs do not provide any substantive content relating to the user's communications. Instead, these third parties are typically configured to track user data and communications for marketing purposes.

59. The web bugs are tiny and camouflaged to purposefully remain invisible to the user.

60. Thus, without any knowledge, authorization, or action by a user, a website developer like Defendant can use its source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' personally identifiable non-public medial information to third parties.

***C. Facebook's Platform & its Business Tools.***

61. Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021.[18] Roughly 97% of that came from selling advertising space.[19]

62. As a core part of its business, Facebook maintains profiles on users that include the user's real names, locations, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, including IP addresses.

63. Facebook also tracks non-Facebook users through its widespread internet marketing products and source code.

64. Facebook then sells advertising space by highlighting its ability to target users.[20]

---

[18] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited April 11, 2023).

[19] *Id.*

[20] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706 (last visited April 11, 2023).

65. Facebook can target users so effectively because it surveils user activity both on and off its site.[21]

66. This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[22]

67. Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[23]

68. Indeed, Facebook utilizes the precise type of information disclosed by Defendant to identify, target, and market products and services to individuals.

69. Advertisers can also build "Custom Audiences."[24] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[25] With Custom

---

[21] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited April 11, 2023).

[22] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting (last visited April 11, 2023).

[23] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences (last visited April 11, 2023).

[24] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited April 11, 2023).

[25] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting (last visited April 11, 2023).

Audiences, advertisers can target existing customers directly, and they can also build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[26]

70. Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[27]

71. As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[28]

72. Put more succinctly, Facebook's Business Tools, including the Pixel and CAPI, are bits of code that advertisers can integrate into their website, mobile applications and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

73. The Business Tools are automatically configured to capture certain data, like when

---

[26] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited April 11, 2023).

[27] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook, Create a Website Custom Audience https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last visited April 11, 2023).

[28] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087 (last visited April 11, 2023).

a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[29]

74. Facebook's Business Tools can also track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[30] Advertisers can even create their own tracking parameters by building a "custom event."[31]

75. One such Business Tool is the Facebook Pixel. Facebook offers this piece of code to advertisers, like Defendant, to integrate into their websites. As the name implies, the Facebook Pixel "tracks the people and type of actions they take."[32]

76. When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to send a separate message to Facebook's servers. This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Facebook Pixel is configured to collect.

---

[29] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited April 11, 2023).

[30] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited April 11, 2023).

[31] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited April 11, 2023).

[32] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

77. This transmission is initiated by Facebook code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code, and Facebook's embedded code.

78. An example illustrates the point; take an individual who navigates to Defendant's Website and clicks on a tab for "AIDS Center." When that tab is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Because the University utilizes the Facebook Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser without alerting the individual that this is happening.

79. Facebook causes the browser to secretly duplicate the communication with Defendant, transmitting it to Facebook's servers, alongside additional information that transcribes the communication's content and the individual's identity. Consequently, when Plaintiffs and Class Members visited Defendant's Website and entered, e.g., Diabetes or Bone Cancer on Defendant's Website, their Private Information was transmitted to Facebook, including, but not limited to, physician and appointment selected, treatments and care options, and specific button/menu selections.

80. During the same transmissions, the Website would also provide Facebook with the patient's Facebook ID, IP address and/or device ID or other personally identifiable information they input into Defendant's Website.

81. This is precisely the type of information that HIPAA requires healthcare providers

to de-anonymize to protect the privacy of patients.[33]

82. Plaintiffs' and Class Members' identities could be easily determined based on the Facebook ID, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

83. After intercepting and collecting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. If the Website visitor is also a Facebook user, Facebook will associate the information that it collects from the visitor with a Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity.

84. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any other person—can use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

85. In other words, the Pixel allows Meta to know what medical content one of its users viewed on Defendant's Web Properties.

86. Notably, this transmission only occurs on webpages that contain the Pixel. Thus, Plaintiff's and Class Members' Private Information would not have been disclosed to Facebook but for Defendant's decisions to install the Pixel on its Web Properties.

---

[33] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited April 11, 2023).

87. Similarly, Plaintiff's and Class Members' Private Information would not have been disclosed to Facebook via CAPI but for Defendant's decision to install and implement that tool.

88. By installing and implementing both tools, Defendant caused Plaintiff's and Class Members' communications to be intercepted and transmitted to Facebook via the Pixel, and it caused a second improper disclosure of that information via CAPI.

***D. How the University Discloses Class Members' Protected Health Information and Assists with Intercepting Communications***

89. Through the Facebook Pixel, Defendant shares its patients' identities and online activity, including information and search results related to their private medical treatment.

90. For example, when a patient visits [https://www.urmc.rochester.edu/](https://www.urmc.rochester.edu/) to search for a doctor, they may select the "Find a Provider" tab, which takes them to the "Find a Provider" page.




***Figure 1. Defendant directs patients to its "Find a Provider" webpage with embedded Pixels.***

91. If a patient selects filters or enters keywords into the search bar on the "Find a Provider" webpage, the filters and search terms are transmitted via the Facebook Pixel. Similarly, if a patient uses the Website's general search bar or chat, the terms and phrases the patient types are transmitted to Facebook, even if they contain a patient's treatment, procedures, medical conditions, and related queries. This information is automatically sent from the patient's device to Facebook, and it reveals the patients FID (c_user field) along with each search filter the patient selected.




***Figure 2. Example of search results for a provider specializing in "Bone Cancer" near 100 State Street, Rochester, NY, 14614.***

92. After taking any of these actions on the Find a Provider page, patients are subsequently directed to the "Provider Search Results" page, and their selections or search parameters are automatically transmitted to Facebook.




***Figure 3. Example of data from a search result for a "Bone Cancer" provider being shared with Facebook along with the patient's Facebook ID (c_user field). While the doctor's specialty and gender are "coded," this does not prevent tech platforms like Facebook from de-coding this data.***

93. Once a patient chooses a doctor, all of the information that patient has submitted is automatically sent directly to Facebook. The information transmitted to Facebook includes: (i) the patient's unique and persistent Facebook ID (c_user ID), (ii) the fact that the patient clicked on a specific provider's profile page (Dr. Emily Carmody in the example above and below), (iii) the patient's search parameters (demonstrating they specifically searched for a female or male doctor and their specialty), and (iv) the patient's location.




***Figure 4. Defendant's transmission to Facebook of patient's search parameters showing search terms including patient's address (the US District Court in this instance), search results displayed to patient, and the patient's FID (c_user field) information.***

94. Defendant's website also includes a feature that allows patients to book

appointments through a particular doctor's profile page. If a patient clicks on the "Schedule an Appointment" button, this action is communicated and shared with Facebook. Facebook classifies this event as a "SubscribedButtonClick," which indicates that the patient clicked the specific button (in order to book the appointment). Similarly, each doctor's profile page includes a direct link that allows a patient to call the doctor's office, and, upon clicking the telephone number button, the patient's click is shared with Facebook.



```
▼ Request Headers
  :authority: www.facebook.com
  :method: GET
  :path: /tr/?id=274864461850090l&ev=SubscribedButtonClick&dl=https%3A%2F%2Fwww.urmc.rochester.edu%2Fpeople%2F%3Faddress%3D100%2520State%2520St%2C%2520Rochester%2
  C%2520NY%252014614%2C%2520USA%2 specialty%3D38.333.0% 2 gender%3D2%26lat% 3D43.1574721%26lon%3D-77.6132586&rl=&if=false&ts=1671915343092&sw=1664&sh=1110&v=2.9.90
  &r=stable&ec=2&o=30&fbp=fb.1.1671085782832.217921790&it=1671915145049&coo=false&es=automatic&tm=3&exp=b3&rqm=GET&cd%5BbuttonFeatures%5D=%7B%22classList%22%3A%2
  2%22%2C%22destination%22%3A%2 tel 3 585-275-5321% 22%2C%22id%22%3A%22%22%2C%22imageUrl%22%3A%22%22%2C%22innerText%22%3A%22(585)%20275-5321%22%2C%22numChildButto
  ns%22%3A0%2C%22tag%22%3A%22a%22%2C%22type%22%3Anull%2C%22name%22%3A%22%22%7D&cd%5BbuttonText%5D=(0)%200-0&cd%5BformFeatures%5D=%5B%5D&cd%5BpageFeatures%5D=%7B%
  22title%22%3A%22Find%20a%20Provider%20-%20University%20of%20Rochester%20Medical%20Center%22%7D&cd%5Bparameters%5D=%5B%5D&cd%5Brex%5D=%7B%22uid%22%3A%2289b89a6s
  3-c10b-4df0-9d26-fbe976e07d50%22%2C%22retry%22%3A0%7D&dt=jhsmmoberyw5avx1l6e4jnys78nu0dha
  :scheme: https
  accept: */*
  accept-encoding: gzip, deflate, br
  accept-language: en-US,en;q=0.9,ru;q=0.8
  cookie: c user=54        ; datr=QtI1Y1lVd2UWOuuBmn2Mb8vC; m_page_voice=540643061; dpr=1.5; xs=188%3AWgt7jCKaF4RNPg%3A2%3A1597289338%3A-1%3A3037%3A%3AAcVO14XdpQIc
  DRQwzkoey6qo_jgueDtITkEW2lPeMFA; fr=0YSVguIZoJw29ucSr.AWVrkQGakfu8_s0MT7iE4YEdZ9o.Bjn2Qp.-f.AAA.0.0.Bjn2Qp.AWV_lzutmSE
  origin: https://www.urmc.rochester.edu
  referer: https://www.urmc.rochester.edu/
```


***Figures 5 and 6. The type of data transmitted during an HTTP single communication session showing that the patient is attempting to make an appointment with a particular provider. This information is automatically sent from the patient's device to Facebook, and it reveals the patient's FID (c_user field) along with the name of the provider, their specialty, and the fact that the patient clicked the phone number button to make an appointment.***

95. Each time Defendant sends this activity data, it also discloses a patient's personally identifiable information.

96. A user who accesses Defendant's Website while logged (or having recently logged) into Facebook will transmit the c_user cookie to Facebook, which contains that user's unencrypted Facebook ID.

97. When accessing the Website, for example, Facebook receives six cookies:

**Request Cookies** ☐ show filtered out request cookies

| Name | Value | Domain |
| --- | --- | --- |
| c_user | 540... | .facebook.com |
| datr | QtI1... | .facebook.com |
| m_page_voice | 540... | .facebook.com |
| dpr | 1.5 | .facebook.com |
| xs | 188... | .facebook.com |
| fr | 0KF... | .facebook.com |

***Figure 7.***

98. When a visitor's browser has recently logged out of an account, Facebook compels

the visitor's browser to send a smaller set of cookies[34]:

| Name | Value | Domain |
|---|---|---|
| c_user | 540... | .facebook.com |
| datr | Qtl1... | .facebook.com |
| m_page_voice | 540... | .facebook.com |
| xs | 188... | .facebook.com |
| fr | 0YS... | .facebook.com |

***Figure 8.***

99. The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[35] Facebook, at a minimum, uses the fr cookie to identify users.[36]

100. At each stage, Defendant also utilized the _fbp cookie, which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user:[37]

| Name | Value | Domain |
|---|---|---|
| _fbp | fb.1.1671026827387.127455195 | .rochester.edu |

***Figure 9. Representation of information shared with Facebook.***

101. The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[38]

102. If that happens, the time resets, and another 90 days begins to accrue.

---

34 Not pictured here and in the preceding image is the _fbp cookie, which is transmitted as a first-party cookie.

35 Data Protection Commissioner, *Facebook Ireland Ltd: Report of Re-Audit* (Sept. 21, 2012), p. 33, http://www.europe-v-facebook.org/ODPC_Review.pdf (last visited April 11, 2023).

36 FACEBOOK.COM, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/ (last visited April 11, 2023).

37 *Id.*

38 *Id.*

103. The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[39]

104. If that happens, the time resets, and another 90 days begins to accrue.

105. The Facebook Tracking Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—i.e., Defendant.[40]

106. A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[41]

107. The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

108. Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to FIDs and corresponding Facebook profiles.

109. As shown in the above figures, Defendant sent these identifiers with the event data.

110. Plaintiffs never consented, agreed, authorized, or otherwise permitted Defendant to disclose their personally identifiable information and protected health information; nor did they authorize any assistance with intercepting their communications. Plaintiffs were never provided

---

39 FACEBOOK.COM, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

40 *First-Party Cookie*, PCMAG.COM, https://www.pcmag.com/encyclopedia/term/first-party-cookie (last visited April 11, 2023). This is confirmable by using developer tools to inspect a website's cookies and track network activity.

41 *Third-Party Cookie*, PCMAG.COM, https://www.pcmag.com/encyclopedia/term/third-party-cookie (last visited April 11, 2023). This is also confirmable by tracking network activity.

with any written notice that Defendant disclosed its Website users' protected health information, nor were they provided any means of opting out of such disclosures. Despite this, Defendant knowingly disclosed Plaintiffs' protected health information to Facebook.

111. By law, Plaintiffs are entitled to privacy in their protected health information and confidential communications. Defendant deprived Plaintiffs and Class Members of their privacy rights when it: (i) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' confidential communications, personally identifiable information, and protected health information to a third party; (ii) disclosed patients' protected information to Facebook – an unauthorized third-party eavesdropper; and (iii) undertook this pattern of conduct without notifying Plaintiffs and Class Members and without obtaining their express written consent. Plaintiffs did not discover that Defendant disclosed their personally identifiable information and protected health information to Facebook, and assisted Facebook with intercepting their communications, until approximately December 2022 for Plaintiff Kane and March 2023 for Plaintiff Wilson.

### ***E. Defendant's Privacy Policies & Promises.***

112. Defendant publishes several privacy policies that represent to patients and visitors to its Website that the University will keep Private Information private and secure and that it will only disclose PII and PHI provided to it under certain circumstances, ***none of which apply here***.

113. Defendant publishes a Privacy Statement which tells patients that the University and its clinical entity are "committed to protecting your privacy. Any information you provide to us through the URMC website—for example, name, address, and phone number—will never be

sold to third parties."[42]

114. Defendant's Privacy Statement further assures Plaintiffs and Class Members that:

> We respect the right to privacy of all patients, families, students, and other visitors to our site. ***We do not collect information that would personally identify you unless you choose to provide it. The protected health information that you submit, such as on the appointment request form, is shared only with those people in URMC who need this information to respond to your question or request.*** Information submitted through URMC online forms may be collected to ensure technical functionality. It will also be utilized to address any inappropriate use of our website. ***We do not save protected health information to use for other purposes, nor do we provide it to any other organizations***.

. . .

> ***We do not collect information that would personally identify you unless you choose to provide it. We also do not share any visitor's protected health information with any third party unrelated to URMC, except in situations where we must provide information for legal purposes or investigations, or if so directed by the patient through a proper authorization***.[43]

115. Defendant's Notice of Privacy Practices explains Defendant's legal duties with respect to Private Information and the exceptions for when Defendant can lawfully use and disclose Plaintiffs' and Class Members' Private Information in the following ways:

- For treatment;
- For health care operations;
- To business associates ("Our contracts with them require that they protect the privacy of your health information");
- For appointment reminders;
- For health-related benefits and treatment activities;
- For fundraising activities;
- For the patient information directory;
- To individuals involved in patient care or payment for patient care;

---

[42] https://www.urmc.rochester.edu/privacy/privacy-statement.aspx (last visited April 11, 2023).

[43] *Id.* (emphasis added).

- For research;
- Incidental disclosures ("Disclosures of your information may occur during or as an unavoidable result of otherwise permissible uses or disclosures of your health information. For example, during the course of your treatment, other patients in the area may see or overhear discussion of your health information despite using reasonable safeguards");
- To personal representatives;
- For limited marketing purposes ("We may use your information for certain limited marketing purposes, such as face-to-face communication. For other marketing activities we will obtain your authorization");
- To comply with the law;
- To address workers' compensation, law enforcement and other government requests;
- For public health purposes including to avert a serious or imminent threat to health and safety;
- For organ and tissue donations;
- To coroners, medical examiners and funeral directors;
- To correctional institutions where patient is an inmate, in limited circumstances;
- To schools (student immunization information);
- To respond to lawsuits and other legal actions.[44]

116. Defendant further acknowledges that it may only sell patients' protected health information without their written authorization only in very limited circumstances, "such as if the covered entity is sold."[45]

117. Defendant also acknowledges the following:

We are required by law to:

- Make sure that medical information that identifies you is kept private;
- Give you this Notice of our legal duties and privacy practices with respect to medical information about you; and
- Follow the terms of this Notice.

. . .

---

44 https://www.urmc.rochester.edu/MediaLibraries/URMCMedia/privacy/documents/NoticeofPrivacyPracticesHIPAA.pdf (last visited April 11, 2023).

45 *Id.*

> You have the right to be notified of a breach of your unsecured protected health information, with a few limited exceptions. A breach is defined as unauthorized acquisition, access, use or disclosure of protected health information in a manner not permitted, unless there is a low probability that the privacy or security of your protected health information has been compromised.
>
> . . .
>
> Other uses and disclosures of medical information not covered by this Notice or the laws that apply to us will be made only with your written authorization.[46]

118. While Defendant's Privacy Statement discloses that it uses "Google AdWords remarketing service to advertise URMC services to previous visitors to our site," it also states that "[a]ny data collected will be used in accordance with our privacy policy and Google's privacy policy."[47] Defendant's privacy policies do ***not*** permit Defendant to use and disclose Plaintiffs' and Class Members' Private Information for marketing purposes.

119. Defendant's assurances that it will keep patients' Private Information confidential and secure, are false.

120. Defendant conceals its use of Facebook Pixels to track patients' personally identifiable information, even when it discusses its use of internet analytical tools:

> The website uses Web analytics software to track visitor activity and to better understand how the website can be improved. ***The website does not allow any third party to track or collect personally identifiable information from users. If personally identifiable data is collected, (see the Protected Health Information section) none of that data will be associated with any other data gathered during the use of this website***.
>
> We may provide third parties with aggregate statistics about our

---

46 *Id.*

47 https://www.urmc.rochester.edu/privacy/privacy-statement.aspx

> visitors, traffic patterns and related site information. These data reflect site-usage patterns gathered during visits to our website, but ***they do not contain behavioral or identifying information about any individual user unless that user has given us permission to share that information***.[48]

121. Defendant admits that it collects patients' IP addresses, but falsely states that this is "not truly personally identifiable information."[49]

122. Defendant also falsely states that "first party cookies" which it uses to "collect information about visitors to our site . . . are never associated with specific personal identities."

123. Defendant violated its own privacy policies by unlawfully intercepting and disclosing Plaintiffs' and Class Members' Private Information to Facebook and third parties without adequately disclosing that Defendant shared Private Information with third parties and without acquiring the specific patients' consent or authorization to share the Private Information.

### *F. Defendant Violated HIPAA.*

124. Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[50]

125. Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

126. In Guidance regarding Methods for De-identification of Protected Health

---

48 *Id.* (emphasis added).

49 *See id*. Under HIPAA, an IP address is considered personally identifiable information. *See* 45 C.F.R. § 164.514 (2); *see also* discussion *infra*.

50 HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[51]

127. In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third* parties without obtaining authorization from each person on the list. (Emphasis added).[52]

***G. Defendant Violated Industry Standards.***

128. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship, it is a cardinal rule.

129. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

---

51 https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited April 11, 2023).

52 https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited April 11, 2023).

130. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

131. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

132. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping with ethics guidelines for confidentiality.[53]

### *H. Defendant Violated New York Standards.*

133. New York State has long been a national leader in protecting the confidentiality of personal medical information.

134. New York State law has strict privacy standards for medical records.

135. Unlike HIPAA, New York requires patient consent before a physician can disclose

[53] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (last visited April 11, 2023).

an individual's medical information to another treating physician.[54] It also limits disclosure to immediately relevant information.[55]

136. Even stronger protections restrict the release of certain especially sensitive information regarding genetic tests,[56] mental health,[57] medical treatment of adolescents,[58] sexually transmitted infections[59] and HIV.[60]

137. New York State Department of Health regulations governing hospitals impose significant privacy and security standards relating to medical records, patient rights, and medical staff by-laws.

138. With respect to medical records, a hospital must ensure the confidentiality of patient records and release records or information from records "only to hospital staff involved in treating the patient and individuals as permitted by Federal and State laws."[61]

139. This provision has been interpreted to require hospitals to obtain consent from the

---

[54] *See* New York Public Health Law § 18(6).

[55] *Id*.

[56] *See* New York Civil Rights Law § 79-l.

[57] *Id*., § 79-j; New York Public Health Law § 18(1)(e); Mental Hygiene Law § 33.13.

[58] Barriers to the Exchange of Pediatric Health Information, NY eHealth Collaborative Privacy & Security Minor Consent Tiger Team, pages 7-8 (July 2, 2010) (describing numerous state law provisions and state and federal case law that create confidentiality rights for minors seeking health care on their own).

[59] *See* New York Public Health Law Chapter 45, § 2306.

[60] *See* New York Public Health Law Chapter 45, Article 27-F.

[61] 10 NYCRR § 405.10 (a)(6).

patient prior to disclosing medical records to an outside entity, even for treatment or reimbursement purposes.[62]

140. A hospital must also institute safeguards to protect the security of medical records, including a system "to ensure the integrity of the authentication and protect the security of all transmissions, records and record entries" as well as implement policies to ensure the security of electronic or computer equipment from unwarranted access.[63]

***I. Plaintiffs' & Class Members' Expectation of Privacy.***

141. Plaintiffs and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

142. Indeed, at all times when Plaintiffs and Class Members provided their PII and PHI to Defendant, they each had a reasonable expectation that the information would remain private, and that Defendant would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

***J. IP Addresses are Personally Identifiable Information.***

143. In addition to patient status, address, medical conditions, treatment, specific providers, appointment information, and patient's unique and persistent Facebook ID, Defendant improperly disclosed patients' computer IP addresses to Facebook through the use of the Pixel.

144. An IP address is a number that identifies the address of a device connected to the Internet.

145. IP addresses are used to identify and route communications on the Internet.

---

[62] *See Williams v. Roosevelt Hospital*, 66 N.Y.2d 391 (1985).

[63] 10 NYCRR § 405.10 (a)(2).

146. IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

147. Facebook tracks every IP address ever associated with a Facebook user.

148. Google also tracks IP addresses associated with Internet users.

149. Facebook, Google, and other third-party marketing companies track IP addresses for use of tracking and targeting individual homes and their occupants with advertising by using IP addresses.

150. Under HIPAA, an IP address is considered personally identifiable information:

a. HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

b. HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See* also, 45 C.F.R. § 164.514(b)(2)(i)(O).

151. Consequently, Defendant's disclosure of patients' IP addresses violated HIPAA and industry privacy standards.

***K. Defendant was Unjustly Enriched from the Use of The Pixel.***

152. The sole purpose of the use of the Facebook Pixel on Defendant's Website was marketing and profits.

153. In exchange for disclosing the personally identifiable information of its patients, Defendant is compensated by Facebook in the form of enhanced advertising services and more cost-efficient marketing on Facebook.

154. Upon information and belief, Defendant was advertising its services on Facebook, and the Pixel was used to "help [Defendant] understand the success of [its] advertisement efforts

on Facebook."

155. Retargeting is a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

156. Upon information and belief, Defendant re-targeted patients and potential patients to get more patients to use its services.

157. By utilizing the Pixel, the cost of advertising and retargeting was reduced, thereby benefitting Defendant.

## REPRESENTATIVE PLAINTIFFS' EXPERIENCES

### *A. Representative Plaintiffs Carol Kane's Experiences*

158. As a condition of receiving Defendant's services, Plaintiffs Kane disclosed her Private Information to Defendant as recently as November 2022.

159. Plaintiff Kane accessed Defendant's Website on her phone and computer to receive healthcare services from Defendant and at Defendant's direction.

160. Plaintiff Kane scheduled doctor's appointments for herself via the Defendant's Website.

161. Plaintiff Kane has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

162. Plaintiff Kane reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

163. Plaintiff Kane provided her Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

164. As described herein, Defendant worked along with Facebook to intercept Plaintiff

Kane's communications, including those that contained Private and confidential information.

165. Defendant willfully facilitated these interceptions without Plaintiff Kane's knowledge, consent or express written authorization.

166. Defendant transmitted to Facebook Plaintiff Kane's Facebook ID, computer IP address, location, and information such as treatment sought, appointment type, physician selected, and button/menu selections.

167. By doing so without her consent, Defendant breached Plaintiff Kane's right to privacy and unlawfully disclosed Plaintiffs Kane's Private Information.

168. Defendant did not inform Plaintiff Kane that it had shared her Private Information with Facebook.

169. Plaintiff Kane suffered damages in, *inter alia*, the form of (i) invasion of privacy; (ii) violation of confidentiality of her Private Information; (iii) loss of benefit of the bargain; (iv) diminution of value of the Private Information; (v) statutory damages; and (vi) the continued and ongoing risk to her Private Information.

170. Plaintiff Kane has a continuing interesting in ensuring that her Private Information is protected and safeguarded from future unauthorized disclosure.

### ***B. Representative Plaintiffs Bonnie Wilson's Experiences***

171. As a condition of receiving Defendant's services, Plaintiff Wilson disclosed her Private Information to Defendant as recently as March 2023.

172. Plaintiff Wilson accessed Defendant's Website on her phone and computer to receive healthcare services from Defendant and at Defendant's direction. Plaintiff Wilson also accessed and used URMC's Portal.

173. Plaintiff Wilson scheduled doctor's appointments for herself via the Defendant's

Website.

174. Plaintiff Wilson has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

175. Plaintiff Wilson reasonably expected that her communications with Defendant via the Website and the Portal were confidential, solely between herself and Defendant and that such communications would not be transmitted to or intercepted by a third party.

176. Plaintiff Wilson provided her Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

177. As described herein, Defendant worked along with Facebook to intercept Plaintiff Wilson's communications, including those that contained Private and confidential information.

178. Defendant willfully facilitated these interceptions without Plaintiffs Wilson's knowledge, consent or express written authorization.

179. Defendant transmitted to Facebook Plaintiff Wilson's Facebook ID, computer IP address, location and information such as treatment sought, appointment type, physician selected, and button/menu selections.

180. By doing so without her consent, Defendant breached Plaintiff Wilson's right to privacy and unlawfully disclosed her Private Information.

181. Defendant did not inform Plaintiff Wilson that it had shared her Private Information with Facebook.

182. Plaintiff Wilson suffered damages in, *inter alia*, the form of (i) invasion of privacy; (ii) violation of confidentiality of her Private Information; (iii) loss of benefit of the bargain; (iv) diminution of value of the Private Information; (v) statutory damages and (vi) the continued and ongoing risk to her Private Information.

183. Plaintiff Wilson has a continuing interesting in ensuring that her Private Information is protected and safeguarded from future unauthorized disclosure.

## TOLLING

184. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs did not know (and had no way of knowing) that their Private Information was intercepted and unlawfully disclosed because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

185. Plaintiffs brings this action on behalf of themselves and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

186. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent through the Pixel on Defendant's Website.

187. The New York sub-class that Plaintiff Wilson seeks to represent is defined as follows:

> All individuals residing in the State of New York whose Private Information was disclosed to a third party without authorization or consent through the Pixel on Defendant's Website.

188. The Nationwide Class and the New York sub-class are collectively referred to herein as the "Classes." Excluded from the Classes are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

189. Plaintiffs reserve the right to modify or amend the definition of the proposed

Classes before the Court determines whether certification is appropriate.

190. **<u>Numerosity, Fed R. Civ. P. 23(a)(1).</u>** The Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are over one million individuals whose PII and PHI may have been improperly accessed by Facebook, and the Class is identifiable within Defendant's records. The majority of those class members are believed to be New York residents.

191. **<u>Commonality & Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3).</u>** Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiffs and Class Members;

b. Whether Defendant had duties not to disclose the PII and PHI of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant violated its privacy policy by disclosing the PII and PHI of Plaintiffs and Class Members to Facebook, Meta, and/or additional third parties.

d. Whether Defendant adequately, promptly and accurately informed Plaintiffs and Class Members that their PII and PHI would be disclosed to third parties;

e. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their PII and PHI had been compromised;

f. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient PHI and PII;

g. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII and PHI of Plaintiffs and Class Members;

h. Whether Defendant violated the consumer protection statutes invoked herein;

i. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j. Whether Defendant knowingly made false representations as to it data security and/or privacy policy practices;

k. Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy policy practices and

l. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their PII and PHI.

192. **Typicality, Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use of the Meta Pixel, due to Defendant's misfeasance.

193. **Adequacy, Fed. R. Civ. P. 23(a)(4).** Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

194. **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3).** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary

duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a defendant, like URMC, with significant resources. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

195. **Policies Generally Applicable to the Class.** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

196. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

197. The litigation of the claims brought herein is manageable. Defendant's uniform

conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

198. **Ascertainability & Notice.** Membership in the Class can be determined by objective records maintained by Defendant and adequate notice can be given to Class Members directly using information maintained in Defendant's records.

199. **Class-wide Injunctive Relief, Fed. R. Civ. P. 23(b)(2).** Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint as Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

200. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information;

b. Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information with respect to Defendant's privacy policy;

c. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and

safeguarding their Private Information;

d. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

e. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

g. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**NEW YORK LAW SHOULD APPLY TO PLAINTIFFS & THE CLASS AS A WHOLE**

201. The State of New York has a significant interest in regulating the conduct of businesses operating within its borders.

202. New York, which seeks to protect the rights and interests of New York and all residents and citizens of the United States against a company headquartered and doing business in New York, has a greater interest in the claims of Plaintiffs and the Class than any other state and is most intimately concerned with the claims and outcome of this litigation.

203. The principal place of business and headquarters of URMC, located at 601 Elmwood Avenue in Rochester, New York, is the "nerve center" of its business activities – the place where its high-level officers direct, control and coordinate Defendant's activities, including major policy decisions.

204. Defendant's actions and corporate decisions surrounding the allegations made in the Complaint were made from and in New York.

205. Defendant's breaches of duty to Plaintiffs and Class Members emanated from New

York.

206. Application of New York law to the Class with respect to Plaintiffs' and Class Members' claims is neither arbitrary nor fundamentally unfair because New York has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiffs and the Class.

207. Under New York's choice of law principles, which are applicable to this action, the common law of New York applies to the nationwide common law claims of all Class Members.

208. Additionally, given New York's significant interest in regulating the conduct of businesses operating within its borders, and that New York has the most significant relationship to Defendant, as it is headquartered in New York, and its executives and officers are located and made decisions which have given rise to the allegations and claims asserted herein, in New York, there is no conflict in applying New York law to non-resident consumers such as some of the potential Class Members.

## CLAIMS

## COUNT I

**INVASION OF PRIVACY**
**(On Behalf of Plaintiffs & the Nationwide Class)**

209. Plaintiffs and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

210. Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class against Defendant.

211. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and the communications platforms and services

therein.

212. Plaintiffs and Class Members communicated sensitive and protected medical information and individually identifiable information that they intended for only Defendant to receive and that they understood Defendant would keep private.

213. Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiffs and Class members is an intentional intrusion on Plaintiffs' and Class members' solitude or seclusion.

214. Plaintiffs and Class members had a reasonable expectation of privacy given Defendant's representations, its Notice of Privacy Practices and Privacy Statement.

215. Moreover, Plaintiffs and Class members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential.

216. Defendant's disclosure of private medical information coupled with individually identifying information is highly offensive to the reasonable person.

217. As a result of Defendant's actions, Plaintiffs and Class members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

218. Plaintiffs and Class members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

219. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class members for the harm to their privacy interests as a result of its intrusions upon Plaintiffs' and Class members' privacy.

220. Plaintiffs and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs

and Class members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

221. Plaintiffs also seek such other relief as the Court may deem just and proper.

## COUNT II

## BREACH OF CONTRACT
**(On behalf of Plaintiffs & the Nationwide Class)**

222. Plaintiffs and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

223. Defendant required Plaintiffs and Class Members to provide their Private Information, including names, email addresses, phone numbers, computer IP addresses, appointment information, and other content submitted into Defendant's Website as a condition of their receiving healthcare services.

224. As a condition of utilizing Defendant's digital platforms and receiving services from Defendant, Plaintiffs and Class Members provided their Private Information and compensation for their medical care.

225. In so doing, Plaintiffs and Class Members entered into contracts with Defendant by which Defendant agreed to safeguard and protect such information, in its Privacy Policies and elsewhere, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and Class Members if their data had been breached and compromised or stolen.

226. Plaintiffs and Class Members fully performed their obligations under the contract with Defendant.

227. Defendant's relevant privacy policies and representations require it to take appropriate steps to safeguard the Private Information entrusted to it by the Plaintiffs and Class

Members.

228. Defendant breached these agreements, which directly and/or proximately caused Plaintiffs and Class Members to suffer damages, including nominal damages.

229. Defendant breached the contracts it made with Plaintiffs and Class Members by failing to safeguard and protect their Private Information, and by failing to provide timely and accurate notice to them that the Private Information was compromised as a result of the Defendant sharing the Private Information with third parties without proper authorization.

230. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and Class Members have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities.

231. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and Class Members are entitled to recover actual, consequential, and nominal damages.

**COUNT III**

**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs & the Nationwide Class)**

232. Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

233. A relationship existed between Plaintiffs and Class Members on the one hand and Defendant on the other in which Plaintiffs and Class Members put their trust in Defendant to protect the Private Information of Plaintiffs and Class Members, and Defendant accepted that trust.

234. Defendant breached the fiduciary duty that it owed to Plaintiffs and Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, the Private Information of

Plaintiffs and Class Members.

235. Defendant's breach of fiduciary duty was a legal cause of damage to Plaintiffs and Class Members.

236. But for Defendant's breach of fiduciary duty, the damage to Plaintiffs and Class Members would not have occurred.

237. Defendant's breach of fiduciary duty contributed substantially to producing the damage to Plaintiffs and Class Members.

238. As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiffs and Class Members are entitled to and do demand actual, consequential, and nominal damages, injunctive relief, and all other relief allowed by law.

**COUNT IV**

**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs & the Nationwide Class)**

239. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

240. Plaintiffs assert this claim in the alternative to their contractual claims.

241. Defendant benefitted from Plaintiffs and Nationwide Class Members and unjustly retained those benefits at their expense.

242. Plaintiffs and Nationwide Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiffs and Nationwide Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

243. Defendant unjustly retained those benefits at the expense of Plaintiffs and Nationwide Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

244. The benefits that Defendant derived from Plaintiffs and Nationwide Class Members was not offered by Plaintiffs and Class Members gratuitously and rightly belongs to Plaintiffs and Class Members.

245. It would be inequitable under unjust enrichment principles in New York and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

246. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT V**

**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs & the Nationwide Class)**

247. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

248. When Plaintiffs and Class Members provided their user data to Defendant in exchange for services, they entered an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

249. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

250. Plaintiffs and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating them not to disclose this Private Information without consent.

251. Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Private Information to a third party, *i.e.*, Facebook.

252. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members would not have used Defendant's services, or would have paid substantially for these services, had they known their Private Information would be disclosed.

253. Plaintiffs and Class Members are entitled to compensatory and consequential damages because of Defendant's breach of implied contract.

**COUNT VI**

**BREACH OF CONFIDENCE**
**(On behalf of Plaintiffs & the Nationwide Class)**

254. Medical providers have a duty to their patients to keep non-public medical information confidential.

255. Plaintiffs and other Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website and the MyChart Portal, which were further buttressed by Defendant's express promises in its privacy policy.

256. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Pixel and CAPI to disclose and to transmit to third parties Plaintiffs' and other Class Members' communications with Defendant including Private

Information and the contents of such information.

257. These disclosures were made without Plaintiffs' or other Class Members' knowledge, consent or authorization.

258. The third-party recipients included, but were not limited to, Facebook.

259. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

260. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and other Class Members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

f. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiffs' and Class Members' Private Information; and

i. Defendant's actions violated the property rights Plaintiffs and Class Members have in their Private Information.

**<u>COUNT VII</u>**

**BAILMENT**
**<u>(On behalf of Plaintiffs & the Nationwide Class)</u>**

261. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

262. Defendant acquired and was obligated to safeguard the Private Information of Plaintiffs and Class Members.

263. Defendant accepted possession and took control of Plaintiffs' and Class Members' Private Information under such circumstances that the law imposes an obligation to safeguard the property of another.

264. Specifically, a constructive bailment arises when a defendant, as is the case here, takes lawful possession of the property of another and has a duty to account for that property, without intending to appropriate it.

265. Constructive bailments do not require an express assumption of duties, and may arise from the bare fact of the thing coming into the actual possession and control of a person fortuitously, or by mistake as to the duty or ability of the recipient to effect the purpose contemplated by the absolute owner.

266. During the bailment, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care, diligence and prudence in protecting their Private Information.

267. Defendant breached its duty of care by failing to take appropriate measures to safeguard and protect Plaintiffs' and Class Members' Private Information, resulting in the unlawful and unauthorized access to, disclosure and misuse of such Information by third parties such as Facebook.

268. Defendant further breached its duty to safeguard Plaintiffs' and Class Members' Private Information by failing to notify them individually in a timely and accurate manner that their Private Information had been disclosed to third parties without Plaintiffs' and Class Members' knowledge, consent or authorization.

269. As a direct and proximate result of Defendant's breach of duty, Plaintiffs and Class Members have suffered compensable damages that were reasonably foreseeable to Defendant, including but not limited to, the damages set forth herein.

**COUNT VIII**

**VIOLATION OF THE NEW YORK DECEPTIVE TRADE PRACTICES ACT**
**New York Gen. Bus. Law § 349, *et seq.***
**(On Behalf of Plaintiffs & the Nationwide Class and**
**Alternatively on behalf of Plaintiff Wilson & the New York sub-class)**

270. Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

271. By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by:

a. promising to maintain the privacy and security of Plaintiffs' and Class Members' protected health information as required by law;

b. installing the Facebook Pixel to operate as intended and transmit Plaintiffs' and Class Members' Private Information without their authorization to Facebook;

c. failing to disclose or omitting material facts to Plaintiffs and Class Members regarding the disclosure of their Private Information to Facebook;

d. failing to take proper action to ensure the Pixel was configured to prevent unlawful disclosure of Plaintiffs' and Class Members' Private Information;

e. unlawfully disclosing Plaintiffs' and Class Members' Private

Information to Facebook.

272. These unfair acts and practices violated duties imposed by laws, including but not limited to, the Federal Trade Commission Act, HIPAA and NY GBL § 349.

273. Defendant's actions also constitute deceptive and unfair acts or practices because Defendant knew it failed to disclose to Plaintiffs and Class Members that their healthcare related communications via the Website would be disclosed to Facebook.

274. Defendant's actions also constitute deceptive and unfair acts or practices because Defendant intended that Plaintiffs and Class Members rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendant's offering of goods and services.

275. Specifically, Defendant was aware that Plaintiffs and Class Members depended and relied upon it to keep their communications confidential, and Defendant instead disclosed that information to Facebook.

276. In addition, Defendant's material failure to disclose that Defendant collects Plaintiffs' and Class Members' Private Information for marketing purposes with Facebook constitutes an unfair act or practice prohibited by the NY GBL § 349. Defendant's actions were immoral, unethical, and unscrupulous.

277. Plaintiffs had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged at https://www.urmc.rochester.edu/.

278. Plaintiffs' reasonable expectations of privacy in the communications exchanged with Defendant were further buttressed by Defendant's express promises in its Notice of Privacy Statement and HIPAA Privacy Notice.

279. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant deployed the Pixel to disclose and transmit Plaintiffs' personally identifiable, non-public medical information, and the contents of her communications exchanged with Defendant to third parties, *i.e.*, Facebook.

280. Defendant's disclosures of Plaintiffs' and Class Members' Private Information were made without their knowledge, consent, or authorization, and were unprivileged.

281. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

282. Defendant willfully, knowingly, intentionally, and voluntarily engaged in the aforementioned acts when it incorporated the Facebook Pixel with knowledge of the Pixel's purpose and functionality.

283. The harm described herein could not have been avoided by Plaintiffs and Class Members through the exercise of ordinary diligence.

284. As a result of Defendant's wrongful conduct, Plaintiffs were injured in that they never would have provided their PII and PHI to Defendant, or purchased Defendant's services, had they known or been told that Defendant shared their confidential and sensitive Private Information with Facebook.

285. As a direct and proximate result of Defendant's multiple, separate violations of the NY GBL § 349, Plaintiffs and Class Member have suffered harm, including financial losses related to the payments or services made to Defendant that Plaintiffs and Class Members would not have made had they known of Defendant's disclosure of their PII and PHI to Facebook; lost control over the value of their PII and PHI; and other harm resulting from the unauthorized use or threat of unauthorized use of their PII and PHI, including for unwanted solicitations or marketing,

entitling them to damages in an amount to be proven at trial.

286. Defendant's acts, practices and omissions were done in the course of Defendant's business of furnishing healthcare-related services to consumers in the State of New York.

287. Plaintiffs bring this action on behalf of herself and Class Members for the relief requested above and for the public benefit to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiffs, Class Members and the public from Defendant's unfair, deceptive and unlawful practices. Defendant's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

288. As a result, Plaintiffs and Class Members are entitled to damages in an amount to be determined at trial, along with their costs and attorneys' fees incurred in this action.

## COUNT IX

**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1) *et seq*.**
**UNAUTHORIZED INTERCEPTION, USE AND DISCLOSURE**
**(On Behalf of Plaintiffs & the Nationwide Class)**

289. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

290. The ECPA protects both sending and receipt of communications.

291. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

292. The transmissions of Plaintiffs' PII and PHI to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

293. **Electronic Communications**. The transmission of PII and PHI between Plaintiffs and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

294. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include [] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

295. **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

296. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiffs' and Class Members' browsers;

b. Plaintiffs' and Class Members' computing devices;

c. Defendant's web-servers;

d. Defendant's Website; and

e. The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient communications.

297. By utilizing and embedding the Pixel on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

298. Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Pixel, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' PII to Facebook.

299. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs' and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

300. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

301. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

302. **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

303. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiffs' and Class Members' PII and PHI for financial gain.

304. Defendant was not acting under color of law to intercept Plaintiffs and Class Member's wire or electronic communication.

305. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' privacy via the Pixel tracking code.

306. Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

307. In sending and in acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person; and (ii) violation of NY GBL § 349.

## COUNT X

**VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**UNAUTHORIZED DIVULGENCE BY ELECTRONIC COMMUNICATIONS SERVICE**
**18 U.S. Code § 2511(3)(a)**
**(On Behalf of Plaintiffs & the Nationwide Class)**

308. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

309. The ECPA statute provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission

on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

310. **Electronic Communication Service**. An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

311. Defendant's Website is an electronic communication service which provides to users thereof the ability to send or receive electronic communications. In the absence of Defendant's website, internet users could not send or receive communications regarding Plaintiffs' and Class Members' PII and PHI.

312. **Intentional Divulgence**. Defendant intentionally designed the Pixel tracking and was or should have been aware that, if misconfigured, it could divulge Plaintiffs' and Class Members' PII and PHI.

313. **While in Transmission**. Upon information and belief, Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications was contemporaneous with their exchange with Defendant's Website, to which they directed their communications.

314. Defendant divulged the contents of Plaintiffs' and Class Members' electronic communications without authorization. Defendant divulged the contents of Plaintiffs' and Class Members' communications to Facebook without Plaintiffs' and Class Members' consent and/or authorization.

315. **Exceptions do not apply**. In addition to the exception for communications directly to an electronic communications service ("ECS")[64] or an agent of an ECS, the ECPA states that

[64] An ECS is "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

"[a] person or entity providing electronic communication service to the public may divulge the contents of any such communication"

> a. "as otherwise authorized in section 2511(2)(a) or 2517 of this title;"
>
> b. "with the lawful consent of the originator or any addressee or intended recipient of such communication;"
>
> c. "to a person employed or authorized, or whose facilities are used, to forward such communication to its destination;" or
>
> d. "which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency."

18 U.S.C. § 2511(3)(b).

316. Section 2511(2)(a)(i) provides:

> It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

317. Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications on Defendant's website to Facebook was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (1) a necessary incident to the rendition of Defendant's service; nor (2) necessary to the protection of the rights or property of Defendant.

318. Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

319. Defendant's divulgence of the contents of user communications on Defendant's Website through the Pixel was not done "with the lawful consent of the originator or any addresses or intend recipient of such communication[s]." As alleged above: (a) Plaintiffs and Class Members did not authorize Defendant to divulge the contents of their communications; and (b) Defendant did not procure the "lawful consent" from the websites or apps with which Plaintiffs and Class Members were exchanging information.

320. Moreover, Defendant divulged the contents of Plaintiffs' and Class Members' communications through the Pixel to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

321. The contents of Plaintiffs' and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

322. As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages; preliminary and other equitable or declaratory relief as may be appropriate; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred.

## COUNT XI

## VIOLATION OF
## TITLE II OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
## 18 U.S.C. § 2702, *et seq*.
## (STORED COMMUNICATIONS ACT)
## (On Behalf of Plaintiffs & the Nationwide Class)

323. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

324. The ECPA further provides that "a person or entity providing an electronic

communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

325. **Electronic Communication Service.** ECPA defines "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

326. Defendant intentionally procures and embeds various Plaintiffs' PII and PHI through the Pixel used on Defendant's Website, which qualifies as an Electronic Communication Service.

327. **Electronic Storage**. ECPA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

328. Defendant stores the content of Plaintiffs' and Class Members' communications on Defendant's Website and files associated with it.

329. When Plaintiffs or Class Members make a Website communication, the content of that communication is immediately placed into storage.

330. Defendant knowingly divulges the contents of Plaintiffs' and Class Members' communications through the Pixel.

331. **Exceptions Do Not Apply**. Section 2702(b) of the Stored Communication Act provides that an electronic communication service provider "may divulge the contents of a communication—"

a. "to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient."

b. "as otherwise authorized in Section 2517, 2511(2)(a), or 2703 of this title;"

c. "with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service;"

d. "to a person employed or authorized or whose facilities are used to forward such communication to its destination;"

e. "as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service;"

f. "to the National Center for Missing and Exploited Children, in connection with a reported submission thereto under section 2258A."

g. "to a law enforcement agency, if the contents (i) were inadvertently obtained by the service provider; and (ii) appear to pertain to the commission of a crime;"

h. "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency"; or

i. "to a foreign government pursuant to an order from a foreign government that is subject to an executive agreement that the Attorney General has determined and certified to Congress satisfies Section 2523."

332. Defendant did not divulge the contents of Plaintiffs' and Class Members' communications to "addressees," "intended recipients," or "agents" of any such addressees or intended recipients of Plaintiffs and Class Members.

333. Section 2517 and 2703 of the ECPA relate to investigations by government officials and have no relevance here.

334. Section 2511(2)(a)(i) provides:

It shall not be unlawful under this chapter for an operator of a

> switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

335. Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications on Defendant's Website to Facebook was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (1) a necessary incident to the rendition of the Defendant's services; nor (2) necessary to the protection of the rights or property of Defendant.

336. Defendant's divulgence of the contents of user communications on Defendant's Website was not done "with the lawful consent of the originator or any addresses or intend recipient of such communication[s]." As alleged above: (a) Plaintiffs and Class Members did not authorize Defendant to divulge the contents of their communications; and (b) Defendant did not procure the "lawful consent" from the websites or apps with which Plaintiffs and Class Members were exchanging information.

337. Moreover, Defendant divulged the contents of Plaintiffs and Class Members' communications through the Pixel to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

338. The contents of Plaintiffs' and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

339. As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may

assess statutory damages; preliminary and other equitable or declaratory relief as may be appropriate; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT XII**

**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (CFAA)**
**18 U.S.C. § 1030, *et seq*.**
**(On Behalf of Plaintiffs & the Nationwide Class)**

340. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

341. Plaintiffs' and Class Members' mobile devices are, and at all relevant times have been, used for interstate communication and commerce, and are therefore "protected computers" under 18 U.S.C. § 1030(e)(2)(B).

342. Defendant exceeded, and continues to exceed, authorized access to the Plaintiffs' and Class Members' protected computers and obtained information thereby, in violation of 18 U.S.C. § 1030(a)(2), (a)(2)(C).

343. Defendant's conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I), *inter alia*, because of the secret transmission of Plaintiffs' and Class Members' private and personally identifiable data and content – including the Website visitor's electronic communications with the Website, including their mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications in real-time ("Website Communications") which were never intended for public consumption.

344. Defendant's conduct also constitutes "a threat to public health or safety" under 18

U.S.C. § 1030(c)(4)(A)(i)(IV), due to the private and personally identifiable data and content of Plaintiffs' and Class Members' Website Communications being made available to Defendant, Facebook, and/or other third parties without adequate legal privacy protections.

345. Accordingly, Plaintiffs and Class Members are entitled to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Carol Kane and Bonnie Wilson respectfully pray for judgment in their favor and against Defendant University of Rochester as follows:

A. For an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C. For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII and PHI disclosed to third parties;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

F. For an award of punitive damages, as allowable by law;

G. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

H. Pre- and post-judgment interest on any amounts awarded; and

I. Such other and further relief as this Honorable Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs Carol Kane and Bonnie Wilson hereby demand that this matter be tried to a jury.

Date: April 21, 2023

Respectfully submitted,

**WEITZ & LUXENBERG, PC**

/s/ James J. Bilsborrow

James J. Bilsborrow
700 Broadway
New York, NY 10003
(212) 558-5500

**ALMEIDA LAW GROUP LLC**

/s/ David S. Almeida

David S. Almeida (pro hac vice forthcoming)
849 W. Webster Avenue
Chicago, Illinois 60614
(312) 576-3024
david@almeidalawgroup.com

*Counsel for Plaintiffs & the Classes*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2023, a copy of the foregoing was filed with the Clerk of the Court via the CM/ECF system, which gave notice to all counsel who have made an appearance in this action.

*/s/ James J. Bilsborrow*
James J. Bilsborrow